**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **PETER J. DAIS IV,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 09-0008-KD-M** |
| | ) | |
| **LOWE'S HOME CENTERS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

This action is before the Court on the motion for summary judgment, brief in support, and evidentiary submissions filed by defendant Lowe's Home Centers, Inc. (Lowe's) (docs. 44-47), the amended response filed by plaintiff Peter J. Dais IV (Dais) and evidentiary submissions (docs. 51, 56), and Lowe's reply and evidentiary submission (docs. 58, 59). Upon consideration and for the reasons set forth herein, the motion for summary judgment as to Dais' claims for employment discrimination is **GRANTED**. [1]

I. Background

Dais filed his complaint against Lowe's on January 6, 2009 and amended his complaint on June 25, 2009 (doc. 21). In the amended complaint, Dais alleges that Lowe's discriminated against him on basis of race because he, a black male, was terminated for an alleged violation of Lowe's sexual harassment policy but a white male who engaged in substantially the same activity was not terminated. Dais brings two counts: Count One alleging violation of 43 U.S.C. § 1981 and Count Two alleging violations of Title VII of the Civil Rights Act of 1964, as amended.

---

[1] Lowe's filed a motion to strike Dais' response to the motion for summary judgment. An order was entered whereby Dais was given an opportunity file an amended motion to address the grounds set forth in the motion to strike. Dais filed an amended motion and a response. Upon consideration, the motion to strike (doc. 51) is **DENIED**.

II. Findings of fact

    A. Dais' employment

    1.  Dais started work at Lowe's in May 2007 as a Loss Prevention Manager and he received a copy of the employee handbook (doc. 46-1, p. 6-7, Dais deposition).

    2.  At that time, Dais initialed and signed a document captioned, "Notice of Lowe's Policies", wherein he acknowledged that "[d]iscrimination, including sexual or other unlawful harassment, by supervisors, fellow employees or customers is strictly against policy and will not be tolerated"  and that sexual harassment should be immediately reported to "your store location manager, district manager, director or customer support center (CSC) department head (doc. 46-1, p. 54, Dais deposition, Exhibit 5, "Notice of Lowe's Policies").  Dais also acknowledged receipt of the "Notice of Lowe's Policies", "Lowe's Orientation Guide", "Lowe's Code of Ethics", and "Data Security Statement."  (Id.).

    3. The Orientation Guide states that "humor or jokes of a sexual nature" or "pictures . . . of a sexual nature" are "types of conduct" which are "prohibited under the No Harassment Policy" (doc. 59-1, p. 6-7, Dais deposition, Exhibit 11).

    4. Dais testified that he was aware of Lowe's sexual harassment policy but that he had "[n]ever been told that" pictures of a sexual nature were a form of sexual harassment (doc. 46-1, p. 22, Dais deposition).  However, Dais testified that he knew this before he came to Lowe's (doc. 46-1, p. 22, Dais deposition).

    5.  Lowe's Human Resources Management Guide classifies violation of the "No Harassment policy (HR Guide Policy # 103)" as a Class A violation of company policy (doc. 46-1, p. 61-62, Dais deposition, Exhibit 10).  The Guide states that "Class A includes the most serious misconduct" and "normally will result in immediate discharge" (Id. p. 61).

    6.  The "No Harassment" "Policy Summary" states that

> Company policy strictly prohibits sexual harassment of any kind. Sexual harassment may include any conduct of a sexual nature that is not welcome and makes a reasonable person feel that the work environment is intimidating, offensive or hostile. . . . See Section IV. Sexual Harassment, for examples of behavior considered to be forms of sexual harassment and prohibited under this policy.

(doc. 46-1, p. 57, Dais deposition, Exhibit 8). Section IV includes "Humor or jokes of a sexual nature" and ". . . pictures . . . of a sexual nature" (doc. 46-1, p. 58, Dais deposition, Exhibit 8).

B. Persons involved

7.     a. Peter Dais IV, (Plaintiff, Loss Prevention Manager)

b. Kim Goodwin (Complainant against Dais)

c. Sharon Hodge, Paul Coffey, Janet Fincher, and Doug Hardiman (Lowe's employees).

d. Doug Hartley (Store Manager)

e. Dot Stanford (Store Human Resources Manager)

f. Aaron Stone (Store Human Resources Coordinator)

g. Van Mansker (Regional Human Resources Manager)

h. Michael Dwyer (Area Human Resources Manager)

i. Tim Smith (Store Operational Manager)

j. George Harriott (Area Loss Prevention Manager)

k. Michael Hodge (Alleged comparator)

l. Christy Mayhugh and Dena Wilkerson (Complainants against Hodge)

C. Dais investigation and termination

8. Dais was terminated on March 28, 2008 for violating the sexual harassment policy (doc. 46-1, p. 67, Investigation Report, Dais deposition, Exhibit 14).

9. In early March 2008, Kim Goodwin, complained to Store Manager Hartley that Dais had an offensive picture of a sexual nature on his cell phone which he showed to her and two other employees – Sharon Hodge and Paul Coffey (doc. 46-7, p. 4-5, Goodwin deposition; doc. 46-3, p.

20, Hartley deposition).

10. Goodwin testified that Hartley referred her to Dot Stanford, the Store Human Resources Manager (Id., p. 5).[2] Stanford contacted Michael Dwyer, the Area Human Resources Manager and he instructed Stanford to take statements immediately (doc. 46-6, p. 6-7, Dwyer deposition). Stanford asked Goodwin to write a statement and then asked Goodwin to write a second statement with more detail (doc. 46-7, p. 5-6, Goodwin deposition). Goodwin did so and destroyed the first statement (Id.; Exhibit 1). Later, Dwyer interviewed Goodwin (Id., p. 8).

11. Goodwin stated that Dais had shown her a picture of a sexual nature on his cell phone and that she had seen him do so before (doc. 46-7, Goodwin deposition, Exhibit 1). At deposition, Goodwin testified that she saw Dais show a picture of a sexual nature to Janet Fincher (doc. 46-7, p. 9, Goodwin deposition).[3]

12. Dwyer and Stanford interviewed Goodwin, Coffey, Fincher, and Sharon Hodge but Hardiman was not available (doc. 46-6, p. 6-7, Dwyer deposition; Exhibit 14, Investigation Report). Dwyer then spoke with Van Mansker, Regional Human Resources Manager, about the information obtained in the interviews (doc. 46-6, , p. 6-7, Dwyer deposition).

13. Mansker told Dwyer that if Dais admitted showing the picture, then Dwyer was to immediately terminate Dais (doc. 51-7, p. 24, Mansker deposition). Mansker testified as follows:

Q.     So you were made aware within a couple of days of [Dais] being terminated that he had been terminated?

A.     Yes.

---

[2] Hartley testified that he could not remember whether he sent Goodwin to Stanford but he told Stanford about the allegation (doc. 46-3, p. 20-21, Hartley deposition).

[3] At deposition, Dais denied showing a picture to Fincher and admitted only that he showed a picture to Sharon Hodge and that Goodwin looked over Sharon Hodge's shoulder to view the picture (doc. 46-1, p. 34-35).

Q.    You had no part in the investigation itself?

A.    No.  That's handled by the area team.

Q.    And you had no part in making the decision that [Dais] was terminated once he admitted to the allegations?

A.    I made the decision.

Q.    You made the decision?

A.    I most certainly did.   . . .

Q.    So Mr. Dwyer's comments yesterday that he immediately terminated Mr. Dais as soon as he admitted to the allegations were incorrect?  . . .

A.    No.  [Dwyer] said - - and I'll paraphrase this - - that he terminated [Dais] after he admitted what he had done.  But I had told [Dwyer] prior to that if Mr. Dais admitted that he had done those things, to terminate him.  That came directly from me.

(doc. 51-7, p. 23-24, Mansker deposition) (brackets added).

14. Dais was not at the store the day the other employees were interviewed and he was interviewed upon his return (doc. 46-6,  p. 7, Dwyer deposition).   Dwyer, Operational Manager Smith, and Area Loss Prevention Manager Harriott, one of Dais's direct supervisors, were present at Dais' interview but not Store Manager Hartley (doc. 46-6, p. 7-8, Dwyer deposition).    Dwyer testified as follows:

Had discussed with Mr. Mansker the upcoming interview with [Dais]; if a person during the interview denies the accusations . . . had denied the behavior, we would do additional interviews. . . . Had spoke with Van Mansker about the options at the end of this interview, that we would move forward, depending on [Dais'] comments. But if [Dais] had admitted to the behavior, that we would terminate him at the end of that - - at that session, that I did not need to put a call back.

Interviewed [Dais].  During the interview with [Dais] he admitted to showing the pictures that he had shown.  He apologized for his behavior.  He stated that he regretted the decisions that he had made and hoped it would not cost him his job.

At that point the operational manager [Smith] informed [Dais] that unfortunately, due to the nature of what had happened, that he would be terminated.

(doc. 46-6, p. 8-9).

15. Dwyer wrote in the Investigation Report that Dais admitted that he had pictures of a sexual nature on his cell phone and that he showed the pictures to at least six other employees on at least three separate occasions but did so as a joke (doc. 46-6, Exhibit 14, Investigation Report).

16. Dais testified that Dwyer interviewed him and asked about the cell phone pictures. Dais testified as follows:

Q. Okay. What else did y'all discuss?

A. I told him I never sexually harassed anyone.

Q. Never.

A. Correct. In my life.

Q. And what did he say?

A. He asked me did I have a picture of a female on my cell phone with a Mountain Dew can.

Q. Okay. And what did you say?

A. I said, yes, sir, I do. Asked him, would you like to see it.   . . .

A. He said no, you just violated Lowe's sexual harassment policy and I'm now terminated from the store.

Q. Okay. All in that one conversation?

A. Yes, sir.

(doc. 46-1, p. 33, Dais deposition)

17. Dais testified that he showed the picture to Sharon Hodge and that she laughed at the picture  (doc. 46-1, p. 33-34, Dais deposition).

18. In regard to Goodwin, Dais testified as follows:

Q. Who else did you show it to?

A. That's it [Sharon Hodge].

Q. Back on - - in March of 2008, did you not also show the photograph to Paul Coffey and Kim Goodwin?

A. I did not show it to Kim Goodwin.

Q. What do you mean by that?

A. She looked at it.

Q. How did she look at it?

A. She looked over Sharon's shoulder and looked at it.

Q. And was Paul Coffey there?

A. I cannot recall.

(doc. 46-1, p. 34, Dais deposition).

19. Dais denied having shown a picture to Fincher or Hardiman, and testified as follows:

Q. The week before you showed the photograph to Sharon and Kim, didn't you also show it to Janet Fincher and Doug Hardiman?

A. No, Sir.

Q. You showed other photographs to them

A. No, sir.

Q. The month before that, did you also show Janet Fincher an obscene photograph on your phone?

A. No, sir.

Q. Did you show Janet and Doug Hardiman photographs of two nude women in an obscene photograph?

A. Did I? No, sir.

(doc. 59-1, p. 3, Dais deposition).

20. Dais testified that the pictures were forwarded to him from another Lowe's employee at a different store (doc. 59-1, p. 3, Dais deposition).

C. Michael Hodge, the alleged comparator

21. On March 9, 2008, Dena Wilkerson prepared a statement wherein she set forth as follows:

> During Christmas Vacation my husband and I were going to dinner when my phone rang. I noticed I had a picture msg. I opened my phone and it was a man dressed in a Santa costume dancing and stripping. My husband took the phone to see what I was - - - - - - - - [unreadable line]. I saw that it was from Michael Hodge. My husband asked why Michael thought he could send something like that to me. I replied, "I don't know."

(doc. 46-6, p. 27, Wilkerson statement).

22. Wilkerson also described three episodes in January [2008] where Hodge "grabbed my butt", where he "took a zip tie and tried to shove it under my butt", and put a pipe "between my breasts and started jiggling" (Id.)

23. Wilkerson stated that she and Christy Mayhugh "had these things happen to us on numerous occasions, so we decided to go to the HR"[4] (Id.). Wilkerson stated that they complained to Aaron Stone because he was the "HR at that time" but that when they told Stone about Hodge's acts and statements, Stone "just didn't seem to take it seriously" and told them that "Michael was just treating us like sisters" (Id.).

24. Wilkerson stated that Stone told her that he talked to Hodge, but the activity did not stop and that Hodge then started telling other employees and customers about the allegations (Id. p. 28). Wilkerson and Mayhugh wanted to be sure that Store Manager Hartley knew what had happened and when they told him, he said that "he was not told anything near what we were telling him" and that Hartley then handled the matter (Id.).

25. Hartley testified that the first time he was made aware of the situation was in a conversation with Wilkerson and that he "immediately called Mike Dwyer" because the "store

---

[4] Wilkerson also stated that Hodge made several other offensive statements to Mayhugh and Wilkerson in addition to the episodes of actual touching (doc. 46-6, p. 27).

human resources manager [Dot Stanford] was not in the building" (doc. 46-3, p. 6-8, 15-16, Hartley deposition). Hartley could not remember the "time specifics" of Wilkerson's and Mayhugh's complaints but did recall the allegation that an email or a video text had been sent around Christmas (Id., p. 8-9). Hartley also called Stanford and "pretty much let them handle everything from there." (Id., p. 12).

26. Hartley testified that Stone was "interim human resources manager" for a period of time after the Human Resources Manager retired and before Stanford came to work in that capacity in late February or early March (Id. p. 11).

27. Hartley denied that Stone talked to him about Mayhugh's and Wilkerson's complaints against Hodge (Id.).

28. Hartley testified that he had a conversation with Hodge about the accusation and that Hodge told him that there was "no merit to it" (Id. p. 13-14).

29. Hartley testified that it was his understanding that Dwyer investigated the allegations and conducted interviews at the store but Hartley was not present when he did (Id. p. 14-15).

30. Dwyer testified that Stanford called him to report that an employee, Wilkerson, wanted a previous investigation readdressed (doc. 46-6, p. 13, Dwyer deposition). Dwyer recalled that one employee "said that she had received an email that she claimed was from Michael Hodge of a sexual nature." (Id. p. 14).

31. Dwyer interviewed Hodge and Hodge "adamantly denied everything that I had brought up with him" (Id. p. 15). Dwyer interviewed Mayhugh and Wilkerson and asked some follow-up questions but that he did not interview anyone else since they said there was no one else who might have knowledge (Id. p. 16).

32. Dwyer testified that his investigation concluded because he did not have enough evidence to take any action (Id. p. 17).

33. Dwyer testified as follows:

In the course of the investigation, my judgment at the end of it, and in conferring with Mr. Mansker, that there was no saved pictures, there was no witnesses to the behavior whatsoever. Michael Hodge had in his interview made an accusation that the two of them were teaming up trying to get him fired, made an accusation on his own. He had no witness to anything. There were no witnesses or corroborating statements to any of the acts that were in those statements. And so I did not have any grounds where you can make a call one way or the other.

(Id. p. 17-18).

34. Dwyer testified that he did not prepare an Investigation Report for Hodge because "there was not going to be any corrective action brought forward on Michael Hodge, and so it did not require me to complete a report." (doc. 46-6, p. 12, Dwyer deposition).

35. Hodge denied the actions which Mayhugh and Wilkerson alleged and specifically denied sending the email to Wilkerson (doc. 46-4, p. 4-6, Hodge deposition).[5] Hodge never admitted to violating the sexual harassment policy (doc. 46-4, p. 6-8).

36. Hodge testified that he made a written statement in July 2009 to the effect that when Stone asked Hodge whether he sent any explicit pictures, Hodge denied that he had and also denied all the behavior of which he was accused (doc. 46-4, p. 14). Hodge wrote as follows:

I was called to the Human Resource Office where I spoke to Aaron [Stone], the resource manager in training. He asked me had I sent any explicit pictures to anyone at the Store through cell phone, or speaking inappropriately to anyone. I was shocked and embarrassed and flatly denied it. I asked who it was accusing me of this. He refused to say.

(doc. 46-1, p. 72, Exhibit 3, Hodge written statement dated July 10, 2009).

37. Hodge testified that Dais later re-typed Hodge's statement on Dais' computer and made the following changes:

_____

[5] At deposition, Hodge did admit to sending an obscene picture to a male co-worker (doc. 46-4, p. 4-5).

> I was called to the human resources office where I spoke to Aaron [Stone], human resources acting manager. He asked me had I sent any explicit pictures to anyone at the store through cell phone or speaking inappropriately to anyone. I did not speak inappropriately but did send pictures, but it was intended as a joke. I said it would not happen again. I asked who was accusing me of this. He refused to say.

(doc. 46-4, p. 12-13, Hodge deposition; doc. 46-4, p. 24, Exhibit 2, Hodge typed statement dated July 10, 2009).

38. Hodge testified that the change was made because he was "afraid they would pull the phone records and they would see that I had sexually explicit material on my phone" (doc. 46-4, p. 14-15, Hodge deposition). Hodge testified as follows: "I didn't realize how serious this was and that my records could be pulled, my phone records and I just wanted to be honest about it" and that was "why" his "statement changed" (Id., p. 15).

D. Sean Robbins' testimony

39. Sean Robbins testified that he is an electrician and routinely buys supplies at Lowe's (doc. 46-5, p. 3-7). In the past, his brother was hired by Dais to work security at a nightclub and Robbins worked for Dais in this capacity from June to November in 2009 (Id.). Robbins has done electrical work in Dais' parents home (Id.). Robbins does not socialize with Dais (Id.). They "talked every once in a blue moon" but did not visit each other's house, eat dinner together, vacation together, or spend any time away from work together (Id., p. 5-6). Robbins saw Dais at Lowe's "every now and then . . . when [he] got material" (Id., p. 5).

40. Robbins testified that Doug Hartley made a racial slur about Dais (doc. 46-5, p. 7, Robbins deposition). Robbins testified as follows:

> I told [Dais] that me and a couple of guys that I work with, we went in [Lowe's] one morning to get material, walking down there and I seen Doug and a couple of other guys over by appliances. I asked him: Have you seen Pete? He said: No, we got rid of him. Or he said I got rid of that N word. I was like, really? He said: Yeah. And that's pretty much the extent of it.

(doc. 46-5, p. 7).

41. Robbins reiterated and testified as follows:

[Doug] said:  We got rid of the nigger and something-something.  He said something about sexual harassment or something.   He apparently had some pictures on his phone that a girl picked up, and they got rid of him.  That's all I pretty much know about that.

(doc. 46-5, p. 8)

42. Robbins testified that he told Dais within "[a] month to two months" after the conversation with Hartley (doc. 51-6, p. 6).

43. Robbins typed a statement at Dais' request and "gave it to him and signed it so he could give it to his lawyer." (doc. 51-6, p. 7).

44. A typed but unsigned statement is attached to the complaint.  The statement is dated April 3, 2008 and indicates that Robbins heard Hartley's statement on the morning of April 1, 2008 (doc. 1, p. 7).

III.  Summary Judgment Standard

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. Id.  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof, 'the moving party is entitled to summary judgment." Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986) (footnote omitted)).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determination of

the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted); Burton v. Tampa Hous. Auth., 271 F.3d 1274, 1276-77 (11th Cir. 2001) ("We review all evidence and factual inferences reasonably drawn from the evidence in the light most favorable to the non-moving party.").

However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Secretary of Dept. of Children and Family Services, 358 F.3d 804, 809 (11th Cir. 2004). Moreover, "the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004) (citation omitted).

IV.   Conclusions of law

Title VII of the Civil Rights Act of 1964, as amended, makes it an unlawful employment practice for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Under 42 U.S.C. § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...." 42 U.S.C. § 1981(a). "Discrimination claims brought under Section 1981 'have the same requirements of proof and [use] the same analytical framework' as those brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)." Garcia v. DS Waters of America, Inc., 372 Fed.Appx. 925, 926-927(11th Cir. 2010) (citation omitted)

(brackets in original).

"A plaintiff may prove a claim of intentional discrimination through direct evidence, circumstantial evidence, or through statistical proof." Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1274 (11th Cir. 2008).    Where the plaintiff asserts that he or she has direct evidence of discrimination, the Eleventh Circuit Court of Appeals in Wilson v. B/E Aerospace, Inc., explains that "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination" and that direct evidence is "evidence that, if believed, proves [the] existence of [a] fact in issue without inference or presumption." 376 F.3d 1079, 1086 (11th Cir. 2004) (citations and internal quotations omitted). The Eleventh Circuit has also stated that "[r]emarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir.1998) (internal quotation marks and citation omitted)). Therefore, the plaintiff must establish that "a biased statement by a decision-maker" was "made concurrently with the adverse employment event, such that no inference is necessary to conclude that the bias necessarily motivated the decision." Williamson v. Adventist Health Sys./ Sunbelt, Inc., 372 Fed. Appx. 936, (11th Cir. 2010); see Holifield v. Reno, 115 F.3d 1555, 1563-64 (11th Cir. 1997) ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case.") (internal quotations and citation omitted).

Where there is no direct evidence of discrimination, the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) applies. In that regard, the Eleventh Circuit recently explained as follows:

> In evaluating a Title VII disparate treatment claim supported by circumstantial evidence, as here, we use the *McDonnell-Douglas* burden-shifting framework. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir.2004). Under this framework, the plaintiff may establish a *prima facie* case of disparate treatment by "showing that [he] was a qualified member of a protected class and was subjected to

an adverse employment action in contrast with similarly situated employees outside the protected class." Id. If a *prima facie* case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. Id. Once the employer satisfies its burden, the burden shifts back to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination. Id.

A "comparator" is an employee outside of the plaintiff's protected class who is similarly situated to the plaintiff "in all relevant respects." Id. at 1091 (quotation omitted). This prevents "courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Burke-Fowler v. Orange County, 447 F.3d 1319, 1323 (11th Cir.2006) (quotation omitted). A plaintiff must show that comparator employees are "involved in or accused of the same or similar misconduct" in order for those employees to be "similarly situated" to the plaintiff. Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir.1997). "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." Wilson, 376 F.3d at 1092 (quotation and emphasis omitted).

Coar v. Pemco Aeroplex, Inc., 372 Fed.Appx. 1, 2-3 (11th Cir. 2010).

V.   Analysis

    A. Direct evidence of discrimination

Dais argues that Store Manager Hartley's racially derogative statement about Dais which was allegedly made to Robbins, a store customer who inquired about Dais, constitutes direct evidence of racial discrimination.  Hartley denies making the statement.  Thus, there is a dispute of fact as to whether the statement was made.  However, for purposes of summary judgment, Lowe's argues that even if Hartley made the statement, it is not direct evidence of discrimination because Hartley was not the decision-maker.  Lowe's also argues that Robbins testified at deposition that the statement was made in April 2009, over a year after Dais was terminated, and thus his alleged racial animus could not have been connected with the termination.

Dais argues that Hartley's statement was made in April 2008 shortly after Dais was terminated in March 2008.  Dais also argues that because Hartley was the store manager, "the facts clearly show that Mr. Hartley had a role in [Dais'] termination".  (doc. 56, p. 12).  Dais argues that

the person who made the decision to terminate him, Regional Manager Mansker, "rubber-stamped" the decision made by Hartley and Dwyer. Dais asserts that Mansker "had no input in the investigation or termination", only met Dais once at a seminar, and "did not attend the interviews of the complainant or the additional witnesses, nor did he study the investigator notes" (doc. 56, p. 23).

The undisputed evidence shows that Hartley was not the decision-maker. The evidence indicates that the decision to terminate Dais was made by Mansker. Dais does not provide any facts or evidence to dispute Mansker's testimony that he made the decision or Dwyer's testimony that he acted upon Mansker's direction.[6] The undisputed facts establish that Mansker told Dwyer that if Dais admitted showing the picture as Goodwin alleged, then Dwyer was to immediately terminate Dais. On March 28, 2008, Dais made the admission and Dwyer, Smith and Harriott terminated Dais as directed by Mansker.

Dais also argues that because Mansker did not participate in the investigation, he "rubber stamped" Hartley and Dwyer's decision to terminate Dais' employment. Dais correctly alleges that Mansker did not participate in the investigation. However, this undisputed fact eliminates one set of circumstances from which communication between Hartley and Mansker could be inferred (doc. 56, p. 4, ¶ 18). Dais correctly alleges that Hartley communicated with Dwyer[7] but Dais makes no allegation of fact that Hartley communicated with Mansker (doc. 56, p. 3, ¶ 13). Since Dais has presented no evidence that Hartley communicated with Mansker, there is insufficient evidence from

---

[6] Mansker also testified that he is an African-American and that Dais' race did not play any role in his decision (doc. 46-2, p. 22, Mansker deposition). Dais does not cite to any evidence to dispute this testimony.

[7] In Dwyer's Investigative Report, he states that Store Manager Hartley contacted Dwyer about the complaint but it does not appear that Dwyer interviewed Hartley or that Hartley was present when Dais was actually terminated (doc. 46-1, p. 67-70) ("Recommendation was made for Peter Dais (LPM) to be terminated . . . Mr. Dais was terminated by Tim Smith (OPS Mgr acting in absence of the Store Manager) and George Harriott (ALPM)" (Id. p. 70). Thus, Hartley's alleged racial bias would also have had to influence Smith and Harriott.

which a reasonable inference could be raised that Hartley's alleged racial bias influenced Mansker.

There is no dispute of fact that Dwyer conducted an independent investigation wherein he interviewed Dais and other employees and reported back to Mansker the results of that investigation. In <u>Dwyer v. Ethan Allen Retail, Inc</u>., 325 Fed.Appx. 755 (11th Cir. 2009), the Eleventh Circuit explained that under the "cats' paw" or "rubber-stamp" theory of discrimination, a "non-decisionmaking employee's discriminatory animus may be imputed to a neutral decisionmaker when the decisionmaker has not independently investigated allegations of misconduct." <u>Id</u>. at 757 citing <u>Llampallas v. Mini-Circuits, Lab, Inc.</u>, 163 F.3d 1236, 1249 (11th Cir.1998). " 'In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus.'" <u>Id</u>. quoting <u>Stimpson v. City of Tuscaloosa</u>, 186 F.3d 1328, 1332 (11th Cir.1999). The Eleventh Circuit concluded that

> summary judgment was appropriate . . . because Dwyer did not make a prima facie case of discrimination under a cat's paw theory. Even assuming that Burton harbored a discriminatory animus towards Dwyer, record evidence showed that Greenberg independently investigated Dwyer's conduct and that Greenberg came to her own conclusion that a Policy violation had occurred.

<u>Id</u>. at 757-758 citing <u>Pennington v. City of Huntsville</u>, 261 F.3d 1262, 1270 (11th Cir.2001) "(where a decisionmaker conducts her own evaluation and makes an independent decision, her decision is "free of the taint of a biased subordinate employee").") The fact that Dwyer conducted the interviews and reported back to Mansker instead of Mansker personally conducting the interviews is of no consequence. The point is that an independent investigation was made, free of Hartley's alleged bias.[8]

Dais presents no evidence from which a reasonable inference could arise that because

---

[8] Dais has not presented any evidence from which an inference could arise that Hartley's racial animus influenced Dwyer's investigation or influenced any of the other employees to make the statements that they made in regard to Dais.

Hartley was the Store Manager, his alleged racial bias "played a role" in Mansker's decision. Therefore, Dais has failed to present direct evidence of intentional employment discrimination.[9]

B. Circumstantial evidence of discrimination

For purposes of summary judgment, Lowe's assumes that Dais can establish that he is a member of a protected group, that he was subjected to an adverse employment action, and that he was qualified to do his job. Lowe's argues that Dais has failed to establish that Hodge is a valid comparator, i.e., a similarly situated employee outside of Dais' protected class which Lowe's treated more favorably than Dais. Lowe's argues that "Hodge was accused of conduct that could not be corroborated by witnesses and that he denied, while [Dais] was accused of conduct that was confirmed by witnesses and to which he later admitted . . ." (doc. 45, p. 20).

Dais argues that the "treatment of Michael Hodge, a white male, clearly meets the qualifications of an employee of equal employment status treated more favorably than the Plaintiff, a member of a protected class" (doc. 56, p. 16). Dais then sets forth the differences between Lowe's formal investigation of the claims against him and the formal investigation of the claims against Hodge such as the time between the complaint and the formal investigation and the absence of a written Investigation Report as to Hodge.

However, despite the alleged differences, the Court finds the case of Abel v. Dubberly, 210 F. 3d 1334 (11th Cir. 2000) dispositive of this action. Abel was fired for misuse of county funds after taking $10.00 from the library cash register, leaving an I.O.U., and subsequently replacing the money. Abel admitted taking the funds on belief that what she had done was an acceptable

_____

[9] Dais argues that the difference between the investigation of Hodge and his investigation constitutes direct evidence of discrimination. However, the Court finds that this evidence is not direct evidence as defined Wilson, 376 F.3d at 1086 ("only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination" and that direct evidence is "evidence that, if believed, proves [the] existence of [a] fact in issue without inference or presumption.").

practice.[10]  She was fired for violating a strict county policy against using county funds for personal

use and the penalty was termination.  Abel argued that this incident was a pretext for discrimination

because the real reason was that she was white.  Abel argued that an African-American library

employee had also taken money from the library but had not been similarly disciplined.  Abel's case

went to trial and the jury found in favor of Abel as to her Title VII claim and in favor of Dubberly

on Abel's Section 1983 claim (some of Abel's claims did not survive summary judgment).

On appeal, the Eleventh Circuit explained[11] as follows:

The outcome on the merits of Abel's suit is dictated by our prior Title VII decisions,
as illustrated by Jones v. Gerwens, 874 F.2d 1534 (11th Cir.1989). The plaintiff in
Jones, like Abel, admitted to his employer violating the work rules for which he was
disciplined and also claimed that fellow employees of another race had committed
the same violations but had not been as severely punished for their transgressions.
See Jones, 874 F.2d at 1540-41. In Jones, we noted that "an employer successfully
rebuts any prima facie case of disparate treatment by showing that it honestly
believed the employee committed the violation" and that an "[a]dmission of
misconduct provides sufficient foundation for an employer's good faith belief that an
employee has engaged in misconduct." See id. at 1540. We then found that the
plaintiff had not met his burden of showing that his conduct was similar to that of
dissimilarly treated employees of another race. See id. at 1541.

Although the setting is somewhat different in the present case, we reach the same
ultimate conclusion as in Jones. First, although Abel claims that she was similarly
situated to an African-American employee who also took county funds for personal
use, a key difference is readily apparent between Abel and the purported comparator.
[ ] Whereas Abel has always freely admitted having taken $10.00 from the cash
register, [ ] the other employee has never confessed to taking county funds for
personal use; at worst, the would-be comparator has admitted to temporarily
misplacing funds. Abel did not offer any evidence sufficient to show that she was

_____

[10]  Dais admitted that he sent the pictures but did so as a joke.  However, that is not an
acceptable practice because jokes of a sexual nature are also prohibited by Lowe's sexual
harassment policy.

[11] The Circuit Court also explained that the same analysis applied to Abel's § 1983 claims
because "discriminatory intent is an element to be shown in the same manner as in an alleged Title
VII violation when the two claims arise from the same conduct and constitute parallel remedies."
Abel, 210 F. 3d at 1339 n.3.

similarly situated to any other employee, and absent some other similarly situated but differently disciplined worker, there can be no disparate treatment. See <u>Jones</u>, 874 F.2d at 1540-41; <u>Nix v. WLCY Radio/Rahall Communications</u>, 738 F.2d 1181, 1185-87 (11th Cir.1984). Furthermore, even if one grants that a similarly situated employee was treated in a different manner, Abel's admission that she took the money rebuts any prima facie case of discrimination, <u>Jones</u>, 874 F.2d at 1540, and Abel still never came close to offering evidence even suggesting either that the Defendants' explanation for her termination warrants disbelief, which would permit but not compel a jury to find in Plaintiff's favor, or that some illegal, discriminatory intent as opposed to purely personal or otherwise non-prohibited animus truly motivated the personnel involved in her termination. See <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

<u>Abel</u>, 210 F.3d at 1339 (footnotes omitted).

Because there is a "key difference" between Dais and Hodge, specifically that Dais admitted when confronted by Lowe's employees that he showed the picture to a co-worker, the Court finds that Dais has failed to provide sufficient evidence of a valid comparator and cannot establish his *prima facie* case of disparate treatment. Also, Dais' attempt to use Hodge's 2009 written or typed statements or deposition testimony that he had explicit pictures on his cell phone at the time he was interviewed is of no consequence. There is no evidence that Hodge <u>admitted</u> to Stone, Hartley, Stanford, or Dwyer[12] that he showed or emailed any picture of a sexual nature to the complainant. To the contrary, Hodge testified under oath that he <u>denied</u> the allegation at all times and the testimony of the Lowe's employees concurs. A valid comparator would be someone who engaged in substantially the same conduct, and "conduct" includes an admission.[13]

Although the Court has determined that Dais cannot establish a *prima facie* case of race

---

[12] Hodge testified that Dwyer did not interview him. Dwyer testified that Hodge denied having the pictures when interviewed. This factual dispute is not material. The material aspect for purposes of establishing a *prima facie* case is whether Hodge admitted or denied to Lowe's employees that he had shown the pictures to the complainant.

[13] Hodge testified that he had explicit pictures on his cell phone when he was interviewed but did not testify that he emailed any explicit pictures to Wilkerson or Mayhugh.

discrimination, the Court also finds that Lowe's has proffered a legitimate non-discriminatory reason for its decision, i.e., Dais' admission that he violated company policy.  As to a showing of pretext, Dais' evidence in regard to the investigation of Hodge and the alleged racially discriminatory statement made by Hartley, does not negate the fact that Dais admitted that he had shown pictures of a sexual nature to coworkers which is a violation of Lowe's policy.  Thus, Dais has not presented sufficient evidence to rebut as pretext the legitimate reason proffered by Lowe's for Dais' termination.  Accordingly, Lowe's is entitled to summary judgment as to Dais' claims of employment discrimination.

VI.  Conclusion

Therefore, upon consideration of the evidence, and for the reasons set forth herein, the Court finds that there is no genuine issue of material fact and Lowe's is entitled to judgment as a matter of law.  Accordingly,  Lowe's motion for summary judgment is GRANTED.

Judgment shall be entered by separate document as provided in Rule 58 of the Federal Rules of Civil Procedure.

DONE and ORDERED this 22nd day of  October, 2010.

 s / Kristi K DuBose
KRISTI K. DuBOSE
UNITED STATES DISTRICT JUDGE